I move the admission of Nicola Felice, who is a member of the Bar and is in good standing in the highest court in the state of New York. I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications. I'm able to say that because Ms. Felice has served as my law clerk over the last approximately 12 months, with the distinction of great help to me and to the court. Yes, motion is granted. Yes, I also move the admission of Stephen DeSalvo, who is a member of the Bar and is good standing in the highest court of the state of New York. I also, I have knowledge of his credentials and I'm satisfied that he possesses the necessary qualifications for the same reason. He served as my law clerk with distinction and great skill. I therefore move his admission to the Bar. We will grant your motion. Should we do all of the admissions, the swearing-in after Judge Hughes? It's motions day. I have two as well. I move the admission of David Katz, who is a member of the Bar and is in good standing with the highest court of New York. I have knowledge of his credentials and I am satisfied that he possesses the necessary qualifications. And like Judge Kovner, I know that because he's been my law clerk for a little under a year. He's got a couple months more to go still, but he's been superb in all ways. And I move the admission of Brian Barnes, who is a member of the Bar and is in good standing with the highest court of Colorado. I have knowledge of his credentials and I'm satisfied that he possesses the necessary qualifications. And likewise, Brian has been a tremendous clerk for the last year or so. He also has about a month to go and I look forward to seeing how he turns out in his career and I'm going to be sad to miss him and David in my chambers. We'll grant the motions and I think it's time for swearing-in. So our first argument of the day is Crimar Systems against Juniper Networks number 181499 and accompanying cases. Please come to the lectern and begin when you are ready. Thank you, Your Honor. May it please the court, my name is Frank Angellari for Crimar. The board made two fundamental errors in these proceedings. The first was allowing what I believe is an unprecedented amount of new material, both a brand new theory and extensive new evidence in the reply, and then compounding that error by not giving Crimar any chance to submit supplemental evidence. The second error was construing the term powered off device to cover any device that has a component not operating. Didn't the board give you exactly the relief you asked for? I looked at your motion it says leave for motion to file a motion to strike or in the alternative a server reply and they granted you leave to file a motion to strike. I mean maybe it was improperly, poorly worded and you should have said either you strike this or we get a server reply but that's not what you asked for and they gave you what you asked for. I believe Your Honor might be referring to the email that was sent to request the motion which was the procedure at that time and the email admittedly was a, it had one sentence on this point and the board construed it to as Your Honor suggested that we were asking for one motion. I think the fair reading of the email is that we were asking for relief in the alternative as Your Honor described. In other words, strike it and if please if you're not going to strike it then give us a chance for a server reply. To the extent there was any doubt we made that clear in the hearing. I think it was about a 30 minute hearing. I mean it's a 30 page transcript on that request and then we also made an offer of proof of a specific evidence at the oral hearing. So I think we made it very clear that we were looking for more than simply a your major argument here and putting aside Powered Off for a moment. As I understand it, the board said two things. One, as to each of the items about which you complain, we don't actually rely on it for our conclusions. It's supportive but we don't rely on it and second, that each of the items that we pay any attention to at all is properly responsive to the patent owner's response. Start with the first. What item, if any, that you object to do you think that the board actually did rely on? Because if the board is right about this then it suggests that regardless of whether there was error, it was probably the two most significant pieces of evidence that were pretty clearly relied on is the new ISO Ethernet theory, which was offered for round one. The board actually made a finding, and this is in APX 132, that Hunter's figure 2 depicts an ISO Ethernet system. Now figure 2 is sort of the key point for Hunter. These claims are directed to... This is, where should I where should I be looking in the Joint Appendix? So the finding is APX 132 is the finding where the board said that figure 2 of Hunter depicts an ISO Ethernet system. And I can wait for your honor. Right, got it. Okay, that's really a central finding and it illustrates, in some respects, many of the things we're talking about. Figure 2 is the, I would say, one of the most important parts of Hunter that the board relied on because it shows what they called phantom power. Our claims require DC current via a path along what we call ECS pairs, in other words the Ethernet data path. And they pointed to figure 2 as having phantom power, which they said was along that path. And then they said it could be an ISO Ethernet system. Well, if you're going to make a finding that figure 2 is an ISO Ethernet system, the fundamental question is what is ISO Ethernet? And that was something that was certainly not briefed because that was never presented. Is what you are saying responsive to, like, so I'll put it this way. Did the board say, even aside from ISO Ethernet, we would make the same finding on, I forget what the other reference was, the Ethernet. It's a reference to, so when they, it's a reference to the term 10BASE-T bus. 10BASE-T bus, right. Okay, when the petition first. Why isn't that good enough? Yes, why is it not good enough? Because the 10BASE-T bus is simply wires. It doesn't have anything to do with the type of device. It doesn't necessarily imply the type of device that's on it. It certainly doesn't necessarily imply the device that has, again, DC current over path, via path across the ECS pairs. It's simply a set of wires. It doesn't mean, it doesn't imply anything about the, and the petitioner switched. In their petition, they pointed to figure 2 and said it has a 10BASE-T bus, therefore it must be an Ethernet terminal equipment. We said that's not true, and they came back with this ISO Ethernet argument, where they said, hey, figure 2 is ISO Ethernet, and they argued that ISO Ethernet can't have a 10BASE-T mode, and therefore it can meet the claims. That's a brand new theory. The board actually made a finding, which, and the reason I'm pointing to the finding, Your Honor, is you said, well, the board said they didn't need it, and what I'm saying is that's almost definitionally incorrect, because they made a central finding on what Hunter teaches. They made a finding that Hunter's figure 2, which is the key figure on this phantom power idea, teaches an ISO Ethernet system, which means a fundamental question with respect to Hunter is, what is ISO Ethernet? That is an issue that was not presented in the petition. All they did was that they've got, the petition has four references to the word ISO Ethernet. None of those four references explain ISO Ethernet. There's no discussion of what it is, and as soon as the board makes a finding that Hunter's figure 2 is ISO Ethernet, the paramount question is, well, what is ISO Ethernet? And that is a question that was raised first in reply, and when we asked to submit evidence on it, we specifically asked to submit an IEEE standard from 1999 that says that when ISO Ethernet is operating in 10BASE-T mode, which is the phantom power, and again, they're saying phantom power gets us the DC current across the contacts, and ISO Ethernet has, Hunter has phantom power in figure 2, and figure 2 is ISO Ethernet. So the whole thing breaks down. That's, so that's the first point, Your Honor, with respect to ground 1. Going back to your question, with respect to ground 2, the petitioners at police, they make a, in their brief, they have an argument that this is essentially harmless error, and they point, I think it's pages 37 to 40 of the red brief, and they say that there's substantial evidence on the ground 1 because of this 10BASE-T bots argument, which is defective for the reasons I described. They make no such argument with respect to ground 2. They don't sit, they don't set up and say, hey, just the information submitted with the petition is sufficient to support this decision. I think that's a tacit admission. I'm sure they'll disagree, but the, the other significant factor is there is so much, there are so many exhibits offered with respect to ground 2. I think it's 16 exhibits. I don't, I don't think it's reasonable to sort of carve it up and say, well, we didn't need it. I mean, this is where we make our statutory argument. When you submit that level of evidence in your reply that is directed to the case-in-chief, I don't think it's proper for the board just to sort of carve it up. There is a sort of weight of the evidence. This, I believe, is an unprecedented amount of evidence. But there's another, there are two additional reasons why, again, I don't believe it's, it's correct to say that the petition alone is sufficient. First, Fisher is a brand new piece of prior art that was submitted in reply, and it was by that I mean this. Ground 2 is BLOCK plus IEEE. BLOCK is a phone system that has, it has what they call phantom power and, and, and phone data on the lines. IEEE is, of course, the standard for an Ethernet terminal device. And there, the leap is that you would take BLOCK's phantom power and create an Ethernet device that would accept it. You'd have to create it, and that's the leap. And, but, BLOCK was, I don't know, a plain old telephone system. Plain old telephone system. And BLOCK, to be very clear, that's not the invention of BLOCK. BLOCK isn't, the invention of BLOCK isn't, doesn't say put phantom power, that's actually old. And BLOCK, in the background section of BLOCK, toward the bottom of the first column, it describes the fact that it's old to have power and data on the same lines. The invention of BLOCK was doing, putting in more data. So it's not like BLOCK was trumpeting the benefits of phantom power, but it's a plain old phone system. But the point is, the very leap that supposedly is obvious is taking this plain old phone and putting on Ethernet. We said that's not obvious and you haven't proved it, and you have a conclusory paragraph from your expert. Well, they offer Fisher as evidence of the very leap. In other words, they say, well, Fisher has phantom power on Ethernet, therefore it's obvious. It is, it is not just evidence of what a person has skilled in the art. It is, it is evidence offered for the claim requirements of current, across the Ethernet contacts. When Fisher teaches phantom power, it sends it across the Ethernet lines, but it splits it off before it gets the device, for the very reasons that we said it's a problem. But anyway, to answer your question, I know this is a long answer. The point is, they don't have a prima facie case without this reply evidence. And can you just remind me, what's the relation between ground one and ground two, if the board was, committed no reversible error on ground one, does ground two matter? Are all the same claims covered? They're, they're redundant, your honor. Okay. But it is of note that, that in some of the findings for ground two, when they were going through the reason to combine findings, they actually cited Hunter as evidence of power over Ethernet being, you know, extant. So, so that they cross over. But, but to answer your question, your honor, the two grounds are, you have to win both. Can you, since you're getting close to your rebuttal time, can I just ask you, just switch for a minute to the, the powered off claims, which is a small subset, but it has this separate issue. And my understanding is that the board's, the key question, or at least key argument on the other side, is the board gave you what you asked for. So why is that wrong? So you could say they reconstituted the construction or they applied it incorrectly. I don't think, I think that's a distinction without a difference. At the end of the day, there's, there's no substantial evidence to support a finding that these combinations teach powered off under the agreed construction. Why? The construction says powered off is without operating power. The Hunter Boolean, which is ground one, it, again, the member of the claims required, two different DC currents across these pairs. And then now with the powered off, you've got to do it while powered off. So Hunter Boolean doesn't generate these two levels of current unless and until it applies operating power. And that's right in the findings. The board talks about how Hunter, the Hunter Boolean combination distinguishes between essentially a normal operating, a normal operating current startup and a current surge, which is even more than operating. So you don't even get to the two levels unless and until you apply operating power. So that's Hunter Boolean. With respect to Block and IEEE, there's no evidence whatsoever of the amount of power being applied to this device. And this is their burden. They've got to show that this phone device is, is, doesn't have any operating power. The Block phone is essentially a telephone waiting to ring. It's just like the phones we all have on our desks now. It's, it's, it's sitting there. It's operating. As soon as it rings, you pick it up and you answer. They found that Block, that the Block phone was powered off because a specific component, namely the speakerphone, was not operating. But that's not the test. That can't be the test. So the reason I said it, it, the claim construction versus, you know, the question of new construction versus reinterpreting their construction versus misapplying their construction, that's a distinction without a difference because at the end of the day, with respect to Block, they found that it's powered off merely because a component, the speakerphone, is not operating. It was their burden to prove, petitioner's burden to prove that Block didn't have operating power. There's, there's nothing about how much operating power is going. It's, that's why the only evidence on which the board relies is the fact that a component is not operating. And that... You, you have just a minute left. So you've used two minutes. I'm trying to answer your question, but I'll stop here. Thank you. We'll restore the rebuttal. Thank you. Mr. Kagan. Good morning, Your Honor. May it please the Court. Jonathan Kagan of Irella and Manila, St. Juniper Networks, arguing for the Apple East. So I want to address Crimar's argument that there was a new ISO Ethernet theory that was advanced, essentially in reply, or that the board found, and that was the basis of, that's the basis of their due process argument. The fact is there was no new ISO Ethernet theory. There is no ISO Ethernet theory at all. The grounds advanced in the petition were essentially twofold on the Hunter and Boulan reference. First, we said, if you look just at the Hunter figure two embodiment as it stands, that renders the claim obvious, because the patent mentions that it uses a 10-base-T bus and a 10-base-T hub. So a person looking at that embodiment as it stands would understand that it practices Ethernet. The second argument was, even if you do not like that argument, there is a reference in the patent. The patent itself teaches at lines 19, sorry, column 19, lines 2 through 8, that this system is not limited to any particular standard. It applies to any local area network, including, but not limited to, ISO Ethernet, Ethernet, ATM, and token rate. So there's essentially two arguments being advanced here. What the patent donor does in response is they say that the figure two embodiment does not actually teach Ethernet, because there are some ISO Ethernet components in that embodiment. And ISO Ethernet is not compatible with Ethernet. They argue that ISO Ethernet does not carry 10-base-T signals. The evidence in reply showed that this argument was false. We pointed to evidence, including evidence in the record, Exhibit 1010, page 165, which was filed with the petition, that expressly shows that ISO Ethernet has a 10-base-T mode, and it can operate in that mode. So the patent donor's argument... What's our standard of review to decide whether you're correct or Mr. Anglair is correct on this subject? Well, on this subject, so it depends exactly what we're talking about. Generally speaking, it's an abuse of discretion standard with regard to the board and decisions that they make interpreting their regulations. Yeah, but as to what is being taught by figure two, is that a substantial evidence question? That would be a substantial evidence question. They're factual determinations that the board made, and those would be reviewed for substantial evidence. So we, the petitioners, are not making an ISO Ethernet argument at all. And we have never advanced an ISO Ethernet argument. Our argument is that figure two, as it stands, including the components, including ISO Ethernet components that are disclosed, does teach Ethernet. And if you look at the final written decision, you'll see the board looks at the evidence and cites to the evidence of it being... There being a 10-base-T hub and a 10-base-T bus. It's a one of reasonable... Of ordinary skill in the art would understand that this teaches Ethernet. But in addition, none of this argument relates in any way to the second ground on which the board also found that the claims were obvious, which is that the specification on the patent, the Hunter, is not limited to ISO Ethernet. It goes to any local area network using any standard. So that would certainly incorporate ISO Ethernet. So they don't even challenge that. And to your question, because all the claims are redundant, there's only one ground on which the board need be affirmed. And all the claims in this case are going to be canceled. So there is... And you can look at, on the petition, page 7982, appendix 7... I'm sorry. That's not true about the small number of powered-off claims. That's correct, Your Honor. Right. I was speaking on the reply issue and the due process. On the powered-off limitation, that does apply to a small number of claims. And I'm happy to address that as well. This is... One thing I did want to mention before I got there was this is exactly the relief that the patent owner had requested. They had sought leave to file a motion to strike or, in the alternative, a motion for a surreply. There was actually a finding in the final written decision by the board. They explained that this is exactly what the patent owner said. Why is that a sensible reading of what they request? And I don't mean just textually. Let's assume that they actually, as I think is true, they literally did ask for permission to file one motion or in the alternative or another. But how could that reasonably have been interpreted to be something other than a sloppy way of saying either get rid of the evidence or let us respond? Well, it may have been a sloppy way of saying it, but it's their sloppy way. What the board found was that, and this is in the final written decision, was that they never followed up and said to the board, look, we would really like either a clarification of a ruling. We want this ruling now. We want an opportunity to file a surreply because the hearing is coming up. So if you look in the final written decision, it's not simply that they made the sloppy ruling. I think Mr. Angellari, if I'm, just correct me if I'm misheard or if this is not right. I think he said that at the oral argument, what's called a hearing there, even though it's just lawyers talking, made this point that they wanted an opportunity to respond if the evidence was going to stay in the record. But, you know, clarifying what was probably pretty evident anyway from the, from what they originally asked. I respectfully would disagree with that. That they didn't say that at the oral argument? At the oral argument, and this is in the, this is in the record, the transcript of the oral argument, these pages, they, what they asked for was either they wanted Leaf to file a 10-page surreply, and the ALJ was very specific, said how many pages do you want? We want a 10-page surreply with two exhibits, or we want a seven-page motion to strike. And this is, this may be sloppy, but this could also be a strategic decision on their part. Because if the, if the evidence, if our evidence, the evidence that we introduced was truly just responsive, was reply evidence, it may not have had any bearing on the ultimate determination, which is exactly what happened. So what the board found for each of these pieces of evidence was that it had actually no bearing on the actual outcome, because the arguments that we made in the petition were sufficient, were strong enough to support invalidity of all the claims. So can you, can you respond to Mr. Angelari's point about why the reference in Hunter to so that there must have been an actual reliance on the ISO Ethernet, so that it can't be harmless? It may have, and then one would get to the question whether it was responsive, but at least it wouldn't be harmless. So what, why, why was 10-base-T not sufficient, sufficient, sorry, in your term? Well, so what we do is we have a teaching, so the question is what would one of ordinary skill in the art understand this, this figure, this example to teach? Would it teach someone, would someone of skill in the art looking at this thing, this could be an Ethernet system or not? And so what we have is, we have a piece of a 10-base-T hub that's in the system, which is a piece of, it's a piece of terminal equipment, and we also have wiring that is referred to as a 10-base-T bus. So the question is, would one of skill in the art looking at this, knowing that there is the infrastructure is supposed to be 10-base-T, which is Ethernet, and there is a piece of terminal equipment in here, which is also Ethernet, would they look at the system and think this is an Ethernet system, or this teaches an Ethernet system? And the board found that they did, we presented evidence, we presented an expert declaration saying a person of skill in the art would understand this to be an Ethernet system, 10-base, the IsoEthernet components are completely consistent with a 10-base-T system. Had the patent owner presented evidence about power in IsoEthernet, it did not get into the record, but had it been in the record, we would have presented contrary evidence. They had a decision to make in terms of how to respond to the exhibit, to figure two, because there's IsoEthernet equipment in the entire infrastructure. They had a decision to make. They're trying to say this doesn't teach Ethernet, and they're going to try to use the IsoEthernet equipment to make that argument. So they could go one of two ways. They can say, well, IsoEthernet is simply not compatible with Ethernet, or they could say, well, it is compatible, but it won't allow power to pass. These are two bad arguments that they could make, but they're incompatible arguments. And they have to decide which bad argument are we going to make, bad argument number one or bad argument number two. You might not have thought of it in those terms. Well, they should have known. They can't make both arguments, because they can't argue both IsoEthernet doesn't operate in 10BASE-T, and it does operate in 10BASE-T, but then it won't pass power. They're inconsistent arguments. I believe it's hard to make both arguments. So they chose. Which one did they want to use? By the way, they could have used the argument that it doesn't pass power. They're aware that IsoEthernet equipment was in there. They could have presented that evidence in their patent order response if they wanted. They made the strategic decision not to. They instead went with that argument number one. They went with the argument that IsoEthernet is simply incompatible with 10BASE-T. They're wrong. We've said they were wrong. Bad evidence is in reply. There's nothing that's a completely proper reply, as the board found. Can you turn to the Powered Off and, in particular, address the point that whether one calls what was going on in the final written decision claim construction or application, where do the relevant prior art references, I guess it's Hunter in the first ground, I'm not sure which. I guess it must be IEEE in the second. It's on the block side? It's blocked up on the block side. Can you teach what the board ultimately interpreted Powered Off to require? First off, we believe this is simply an application of the claim construction, which is the board said. In which case, why is it supported by substantial evidence? So in Hunter plus Boulogne, what you have is a startup sequence that the Boulogne circuit does. And so before it allows operating power to get to the terminal equipment, there's this DC to DC converter. And so when the power starts up, it goes through essentially a check. And it determines if the system is operating correctly. And if and only if it determines that the system is operating correctly, and it may go through several iterations to do this, does it then send power to the terminal equipment, operating power to the terminal equipment? So the terminal equipment itself is powered off unless and until that startup circuit is complete. And I think the board does a very good job in the final written decisions of explaining this. In that startup sequence, it's undisputed that the system itself, remember, Hunter is a system for providing powering terminal equipment, powering other equipment. It's not doing that. It's going through the startup check. And so just this component, it's only this component of the equipment. It's not the equipment itself that is receiving power. And this is where I think Primar is playing word games. And during that process, before the terminal equipment comes on, while the checking is going on, are all the other elements of the claim met? Well, the other elements of the claim are met, except for the ones that require actual power motion. But one of the elements of the claim is that certain things happen while the system is powered off. Certain things that are not challenged on appeal. So the only element that's being challenged on appeal is the power off limitation in terms of this claim construction. And so it's during that startup sequence. That's what the board talked about. That's what the board relied on for Hunter plus Mulan. The equipment is off. And by the way, Primar itself agreed at the hearing. The question is not whether a component such as the DC converter, the Mulan circuit has power. It's not whether a component has power. They argued at the hearing, the oral hearing itself, that the question is whether the equipment as a whole has power. And it is not disputed that during the startup sequence, the equipment as a whole is not receiving power. I can go to the block reference, block IEEE. So the block is a little bit more than just a regular telephone. It's a system where you have a central unit and a remote terminal unit, like a speakerphone. And you have a central unit that sort of controls the communications. In block, what the board found is when the phone is off, when it's on the hook, when the speakerphone is off, when it's receiving its power, it's essentially receiving no... The terminal itself is receiving no power. There are still control signals that are being sent between the phone and the central unit that are done by having slight changes in the amount of power that's going back and forth that provides status information about the phone. So power is being received at varying levels while the equipment itself is powered off. What's the purpose of that power before it's turned on? So you have a central system. For example, I don't know if you remember the old phones where there were buttons and there were lights when you would hit what line was on and what line was off. So at the central station, this is a way that someone who's not in that room can see which lines are being used, for example. So you can send a little pulse saying, line one is on the hook, line two is off the hook. So it just provides status information about what lines are being used or not used as an example. If you have nothing further, then go for it. Are you powered off? I will power off. Thank you. And Mr. Angiolari, three minutes for rebuttal. Thank you, Your Honor. Just, I think it's two points. One is my colleague does not understand our position with respect to powered off in one very significant respect. I believe he said that there's no dispute that in the Hunter BlueLand ground one, I believe he said there's no dispute that the device as a whole is not receiving power, something to that effect. That is definitely disputed. In the Hunter BlueLand system, you have a terminal device and the board found that the DC converter is part of that device. That entire device is receiving this operating power and then on the front end, they're doing the sort of flipping that creates the different magnitude current. But our position is that the entire device is in fact receiving greater than operating power. So that is our position. It may be that components downstream of the DC converter have not yet started to operate, but the device as a whole is receiving operating power. And that's confirmed by the findings of the board where they talked about surge in current and normal versus greater than. That's point number one. Point number two. But then that would get to the question whether some component, essentially the television example that was talked about, whether that could still reasonably be considered in the powered off state. Yes, and the specification has an example where, and the television is consistent with this, where a device as a whole is powered off even though a tiny component is receiving a tiny amount of power which cannot operate the whole device. Perhaps, for example, in our spec because it's isolated from the rest of the device. And so the television component argument is that it's just like the device in the spec where if you have one component that is operating, but perhaps isolated from the rest of the system and it's getting power perhaps from a different path than the device receives, which is exactly how our spec works, then it's the device as a whole isn't getting operating power and can't get operating power. Hunter-Mulan is fundamentally different because the device as a whole is in fact receiving all of its operating power during this startup phase. So that's point number one. Point number two, with respect to Hunter and Figure 2, Judge Clever, you asked a question about the standard of review for what Figure 2 teaches. And I want to clarify that we are not disputing the board's finding that Figure 2 teaches ISO Ethernet. Rather, that is a fundamental reason why the board got it wrong on this whole question of a new theory and reply. The question of what ISO Ethernet is was never raised in the petition. And if Hunter-Figure 2 is an ISO Ethernet system, then a fundamental burden of the petitioners is to prove that an ISO Ethernet system meets the claim. That's something that they didn't make any effort to do. It's not a question of whether Figure 2 is an Ethernet system or an ISO Ethernet system. That question is settled by the board at their request. It is an ISO Ethernet system. Therefore, the fundamental question that they had to answer in the petition is whether an ISO Ethernet system meets the claims. They made no effort to do that. Now, Mike, you're over your rebuttal time, so please wrap up. I will. With respect to whether we made a bad decision on how we characterize ISO Ethernet in our Patent Owner Response, we had no reason to fully develop what an ISO Ethernet system is because they never argued that that was an ISO Ethernet system. Again, at Appendix 27033, which is the hearing, we affirmatively said that we wanted to offer evidence which showed that an ISO Ethernet system does not deliver operating power when operating in Ethernet mode. Thank you very much. Thank you. The case is submitted.